**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| ROBERT GARY VANDERVALK, | No. ED CV 14-1824-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on September 11, 2014, seeking review of the Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on September 18, 2014, and October 6, 2014. Pursuant to the Court's Order, the parties filed a Joint Stipulation on April 23, 2015, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

## II.

## BACKGROUND

Plaintiff was born on January 12, 1967. [Administrative Record ("AR") at 22, 33, 146, 158.] He has past relevant work experience as a construction worker II, van driver, landscape laborer, and plumber. [AR at 22, 51.]

On April 29, 2011, plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that he has been unable to work since January 1, 2007. [AR at 11, 146-53, 158-65.] After his applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 68.] A hearing was held on March 15, 2013, at which time plaintiff appeared represented by an attorney, and testified on his own behalf. [AR at 29-55.] A vocational expert ("VE") also testified. [AR at 48-53.] On April 10, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from January 1, 2007, the alleged onset date, through April 10, 2013, the date of the decision. [AR at 11-24.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 6.] When the Appeals Council denied plaintiff's request for review on August 15, 2014 [AR at 1-3], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)

(same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

**A.  THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996. In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability

to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. Id. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

### B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date.[1] [AR at 13.] At step two, the ALJ concluded that plaintiff has the severe impairments of cervical degenerative disc disease/degenerative joint disease; cervicalgia; gastroesophageal reflux disease; hypertension; migraine headaches; and lumber myofascial pain. [AR at 14.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments

---

[1] The ALJ noted that plaintiff had earning records for 2007-2012, reflecting that he worked after the alleged disability onset date, but stated that it was "difficult to tell if this work activity rose to the level of substantial gainful activity because most of the work was overlapping and was through self-employment in which the claimant was often paid in cash." [AR at 13; see also infra Part V.A.2.] The ALJ "resolved this conflict in the light most favorable to the claimant." [Id.] She also concluded that plaintiff meets the insured status requirements of the Social Security Act through December 30, 2015. [Id.]

in the Listings. [Id.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[3] as follows:

> [H]e can stand and/or walk for a total of six hours out of an eight-hour workday, but no more than one to two hours at a time; he can sit for six hours out of an eight-hour workday, but with brief position changes after one to two hours; he can occasionally bend, stoop, climb stairs, balance, kneel, crawl, squat, and crouch; he cannot climb ladders, ropes, or scaffolds; he cannot work at unprotected heights, around moving machinery, or other hazards; he cannot do job[s] requiring hypervigilence or intense concentration on a particular task, meaning the individual cannot be off tasks for the briefest amount of time, like watching a surveillance monitor or where safety might be an issue; he should avoid concentrated exposure to vibrations; he is limited to unskilled work; he cannot perform fast paced production or assembly line type of work; and there should be no repetitive or constant gross or fine manipulation or reaching with the right dominant hand.

[AR at 14-15.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform any of his past relevant work as a construction worker II, van driver, landscape laborer, or plumber. [AR at 22, 51-52.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as an "inspector" (Dictionary of Occupational Titles ("DOT") No. 529.687-114), "assembler" (DOT No. 706.684-022), and "packager" (DOT No. 559.687-074). [AR at 23, 76-79.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of January 1, 2007, through April 10, 2013, the date of the decision. [AR at 23-24.]

---

[2] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when she: (1) rejected plaintiff's subjective symptom testimony; and (2) failed to properly develop the record. [Joint Stipulation ("JS") at 2.]

As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

### A. CREDIBILITY

Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony. [JS at 3-11.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if the claimant meets the first test, the ALJ may reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003). Factors to be considered in weighing a claimant's credibility include: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); 20 C.F.R. §§ 404.1529(c), 416.929(c).

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not find "affirmative evidence" of malingering [see generally AR at 15-21], the ALJ's reasons for rejecting a claimant's credibility must be specific, clear and convincing. Burrell v. Colvin, 725

6

F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id. at 1138 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted). The ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." Bunnell, 947 F.2d at 345-46 (citation and internal quotation marks omitted). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Id. at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

As summarized by the ALJ, plaintiff testified as follows:

> [H]e worked during the first quarter of 2012 as a caregiver for his grandfather. He claimed he stopped doing this work because he could no longer do it. The claimant alleged he is disabled and unable to work due to neck pain, back pain, headaches, arm numbness, and high blood pressure. He claimed he is in pain all day long and has headaches all the time. He alleged his pain is a 7 or 8 on a 10 point scale. He also claimed his equilibrium is off two to three times a day. The claimant contended he experiences bad days the majority of the time and spends the day lying down. He claimed he has gone to the hospital a couple times due to his pain, but they only give him a shot.
>
> Due to his impairments, the claimant alleged he could sit for one to two hours at a time and stand for one to one and a half hours at a time. He stated he had difficulty turning his neck from side to side, bending, and doing daily household chores or yard work.

[AR at 15 (citing AR at 36-48, 184, 215).] Additionally, plaintiff reported he takes Amitriptyline[4] to sleep and relax, Norco for pain, and medication for his cholesterol and high blood pressure. [AR at 38-39.] He has a medical marijuana card and smokes marijuana every now and then, and has had physical therapy and injections in his neck, which he claimed did not help. [AR at 40, 43.] He stated that his doctor has recommended neck and back surgery but admitted that a surgery

---

[4] The Court notes that in the hearing decision, this medication is incorrectly referred to as "Amitripline." [Compare AR at 16 with AR at 38, 654.]

7

date has not been set for his neck because his doctor wants to "try the injections again once more and then if that doesn't work . . . talk about the surgery." [AR at 37, 43.] In his function reports and pain questionnaire plaintiff claimed he has difficulty "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, seeing, climbing stairs, completing tasks, concentrating, understanding, and using hands." [AR at 205-12, 235-42.] He claims his impairments affect his memory and sleep; that he suffers from unusual fatigue and requires two or more naps a day; and that he has pain in his neck, back, lower back, arms, and legs all the time, and any type of movement -- including sitting, standing, and walking -- causes pain. [AR at 210, 240.] Plaintiff also claims that his medication causes "fogginess" and that physical therapy and pain management treatment have been unsuccessful. [AR at 42-43, 230.]

The ALJ found plaintiff "not entirely credible" and his credibility "diminished," for the following reasons: (1) the record reflects work activity after the alleged onset date, and plaintiff has engaged "in a somewhat normal level of daily activity and interaction"; (2) plaintiff's allegations are greater than expected in light of the objective evidence of record,[5] and the positive objective clinical and diagnostic findings do not support more restrictive functional limitations than those in the RFC; and (3) plaintiff's treatment has been routine, conservative, and sporadic, and the "lack of more aggressive treatment or surgical intervention suggests the claimant's symptoms and limitations were not as severe as he alleged." [AR at 16-21.] Notwithstanding the ALJ's discounting of plaintiff's testimony, the ALJ stated that she gave plaintiff "the benefit of the doubt based on his subjective complaints," and "assessed additional functional limitations" in determining the RFC. [AR at 20, 21.]

/

/

---

[5] The ALJ noted that although plaintiff alleged an onset date of January 1, 2007, disability benefits are "payable only 17 months prior to the application date," i.e., after November 2009. [AR at 17.] Although the ALJ "reviewed and considered all the medical records," only the "records from the payable period, which is from November 2009 onwards," were summarized as the earlier records were of "limited relevance . . . in determining the claimant's disability status for the period at issue." [Id.]

8

### 1.     Objective Evidence and Routine, Conservative Treatment

The ALJ found that the objective medical evidence, including diagnostic and objective findings, was inconsistent with plaintiff's testimony of disabling impairment, and also that plaintiff's treatment has been routine, conservative, and sporadic. [AR at 16-21.] The absence of objective medical evidence to support a plaintiff's subjective complaints is a factor that an ALJ can consider in evaluating symptom testimony. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (finding that while medical evidence alone cannot discredit testimony as to pain, it is one factor that the ALJ is permitted to consider). Here, the ALJ summarized the medical evidence since 2009 and determined that the medical evidence supported her RFC finding of a reduced ranged of light work. [AR at 14-21.]

In support of her credibility finding, the ALJ specifically discussed the following [AR at 17-18]: a November 9, 2009,[6] x-ray that showed avulsion fractures of L2 and L3 [AR at 648]; a November 9, 2009, CT scan of the lumbar spine that showed left transverse process fractures at L2 and L3 [AR at 635]; a November 10, 2009, physical examination that showed tenderness to palpation, decreased range of motion of the lumbar and cervical spines, radiculopathy, and a diagnosis of an L2-L3 transverse process fracture [AR at 654]; a November 17, 2009, evaluation by orthopedic spine surgeon, Jeffrey A. Martin, M.D., who noted plaintiff had been in a motorcycle accident four years prior, had good range of motion of the neck and back, normal strength of the upper and lower extremities, normal reflexes and sensation, and a negative straight leg test [AR at 634-36]; Dr. Martin also noted that a November 17, 2009, x-ray showed "*significant* cervical degenerative changes at multiple levels, C3-4, C5-6 and C6-7," and diagnosed plaintiff with cervical degenerative changes with ongoing neck and arm complaints and L1-L2 transverse process fractures [AR at 636]; a December 30, 2009, MRI of the cervical spine that showed 4-5

---

[6]  According to the ALJ, records prior to November 2009 show treatment with prescription medication, physical therapy, pain management, and referral to a neurologist; three visits to the emergency room for treatment of plaintiff's back and neck pain, and headaches; diagnostic tests including MRIs of the brain and cervical spine, x-rays of the cervical, thoracic, and lumbar spines, and a CT scan of the brain; physical examinations; and, as per plaintiff's report to the orthopedic consultative examiner on January 25, 2009, six prior epidural injections and physical therapy, without relief of symptoms. [AR at 17 (citations omitted).]

9

mm focal right posterolateral disc protrusion at C6-C7 [AR at 618]; and a January 10, 2010, diagnosis by a walk-in clinic physician of cervical spine herniation and fracture of L1-L2. [AR at 192.]

On March 11, 2010, plaintiff underwent a neurological surgery consultation for his complaints of neck pain, headache, and numbness in the right arm. [AR at 613-15.] Physical examination showed mild limitation in range of motion of the neck, poorly performed lateral bending, mild to moderate paravertebral muscle tenderness, point tenderness over the occipital nerves bilaterally, mild weakness of the right triceps musculature, and reduced sensation in the right C7 dermatome. [AR at 614-15.] Plaintiff was diagnosed with right C7 radiculopathy and C6-C7 disc protrusion, referred for a cervical spine x-ray series and an EMG, and the doctor, Lawrence E. Clark, M.D., stated that "surgical intervention does appear prudent." [AR at 615.] From October 2010 to March 2011, treatment notes showed tenderness to palpation of the neck and back; decreased range of motion of the neck and back; spasms and crepitation in the neck; and decreased deep tendon reflexes. [AR at 19 (citing AR at 588, 589, 591, 593-95).]

On April 11, 2011, plaintiff had a consultation with Kevin Yoo, M.D., at a spine and neurosurgery center. [AR at 572-75.] Plaintiff complained that previous epidural steroid injections made his condition worse, and the results of the physical examination showed normal range of motion of the head, neck, spine, and upper and lower extremities, normal strength and reflexes, and no numbness. [AR at 572-74.] Dr. Yoo diagnosed cervicalgia, possible right C7 radiculopathy, and chronic pain syndrome. [AR at 574.] He indicated that plaintiff "seems to have a chronic pain syndrome that based upon the MRI [of the cervical spine] that is approximately a year and a half old is not a good surgical candidate," and asked plaintiff to obtain a new MRI of the cervical spine and return for a follow up visit.[7] [Id.] A November 15, 2011, MRI showed multilevel mild spondylosis without significant central canal narrowing at any level; left paracentral

---

[7] This statement is not especially clear -- it seems to imply that the year and a half old MRI itself shows that plaintiff was not a good surgical candidate at that time and, because the MRI was taken so long ago, the doctor would not make a recommendation about surgery without seeing an updated MRI.

1  disc osteophyte complex at C5-C6 causing abutment with minimal deformity of the left central
2  spinal cord; moderate right neural foraminal narrowing at C6-C7, and mild right neural foraminal
3  narrowing at C3-C4, and C5-C6; facet joint arthropathy, worse in the lower cervical spine; and no
4  abnormal spinal cord signal.  [AR at 716-18.]
5       On March 20, 2012, plaintiff saw a neurologist for his cervicogenic headaches.  [AR at 779.]
6  The physician noted that plaintiff was being treated with medication and if that did not work, he
7  would have to do a cervical block.  [Id.]  X-rays of the lumbar spine and coccyx taken on March
8  23, 2012, were normal.  [AR at 777, 778.]  On June 12, 2012, physical examination showed
9  spasms and decreased range of motion of the neck, decreased range of motion of his back,
10 positive straight leg raising, and decreased deep tendon reflexes.  [AR at 776.]  On October 9,
11 2012, plaintiff went to the emergency room for his headaches and was told to continue his current
12 medication, was given new prescriptions for steroids and Amitryptyline, and encouraged to do
13 range of motion exercises and stretching.  [AR at 775.]  He also was given referrals to neurology
14 and orthopedics.  [Id.]  On January 3, 2013, plaintiff was treated with prescription medication for
15 his cervicalgia, GERD, migraine headaches, chronic low back pain, hypertension, and cervical
16 degenerative disc disease/degenerative joint disease radiculopathy.  [AR at 770.]  At a follow-up
17 consultation on January 8, 2013, plaintiff stated he did not want to undergo any cervical blocks
18 because the last one on May 8, 2012, had not helped, and actually made him feel worse.  [AR at
19 765.]  Plaintiff testified that his physician, Dr. Uddin, is "trying to figure out which [surgery] is more
20 important to do . . . first," plaintiff's back or his neck.  [AR at 37.]
21      The ALJ commented that "[i]t should be noted the claimant did not undergo any surgical
22 intervention for his conditions."  [AR at 20.]  Throughout her summary of the evidence, the ALJ
23 repeatedly emphasized that the treatment plaintiff received was routine, conservative, and
24 sporadic.  [AR at 18; see also generally AR at 19, 20, 21.]  The ALJ's summary, and the record,
25 do not support this finding.
26      An ALJ may properly rely on the fact that only routine and conservative treatment has been
27 prescribed.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).  "Conservative treatment" has
28 been characterized by the Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain*

*medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain." Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999).

Here, the record reflects that from 2005 through 2013, plaintiff has been subjected to numerous diagnostic tests including x-ray examinations, CT scans, MRIs, EMG testing, and physical examinations. He has been treated extensively with prescription medications for pain and for help sleeping, hot/cold pack therapy, epidural injections/cervical blocks, and physical therapy (including manual therapy, therapeutic activities, therapeutic exercises, neuromuscular re-education, and electrical stimulation), and he has been referred to, and been treated by, neurologists, orthopedists, and pain management specialists. Although true that plaintiff has not had any surgical intervention, Dr. Clark stated surgical intervention appeared "prudent" [AR at 615], and Dr. Yoo later stated that plaintiff was not a candidate for surgery [AR at 574 (but see supra note 7)] -- thus implying that these doctors were at least considering the potential need for surgery and whether or not plaintiff's conditions were such that surgery would be a viable option. Notwithstanding this, the Court is unaware of any requirement or case law that a recommendation for surgical intervention is a necessary precursor to finding a claimant's subjective symptom allegations to be credible.

With regard to spinal injections, this Court has previously found that spinal epidural injections are not "conservative" treatment. See, e.g., Harvey v. Colvin, 2014 WL 3845088, at *9 (C.D. Cal. Aug. 5, 2014) (injections to the cervical region consisting of stellate ganglion blocks that were not entirely effective did not support ALJ's reliance on conservative treatment to support an adverse credibility finding) (citing Yang v. Barnhart, 2006 WL 3694857, at *4 (C.D. Cal. Dec. 12, 2006) (ALJ's finding that claimant received conservative treatment was not supported by substantial evidence when claimant underwent physical therapy and epidural injections, and was

12

treated with several pain medications)); see Miller v. Astrue, 2009 WL 800227, at *3 (E.D. Cal. Mar. 25, 2009) (ALJ's finding that claimant was not credible properly considered "the conservative nature of [claimant's] treatment" since claimant "was not a surgical candidate, did not use a TENS unit, had not undergone epidural steroid injections and only intermittently took pain medications"). In any event, the fact that plaintiff has received, and been recommended to receive spinal injections to help control his pain is relevant for purposes of determining whether treatment has been "conservative." See Meanel, 172 F.3d at 1114 (stating that a physician's failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain" may be evidence of conservative treatment).

Accordingly, substantial evidence does not support the ALJ's findings that the objective medical evidence was inconsistent with plaintiff's testimony of disabling impairment, and that plaintiff's treatment has been routine, conservative, or sporadic, and these were not specific, clear and convincing reasons for discounting plaintiff's subjective symptom complaints.

### 2. Activities of Daily Living

The ALJ also relied on plaintiff's activities of daily living to support her credibility determination. [AR at 16-17.] She stated that plaintiff "has engaged in a somewhat normal level of daily activity and interaction," including taking care of his children (aged 13, 16, and 18 at the time of the hearing, and all in school [AR at 35]), driving his children to and from school and taking them to the store; preparing his own meals; shopping a couple of times a week; spending time with others watching movies, barbequing, and visiting; and watching television. [Id.] Plaintiff also takes care of his personal hygiene without assistance. [AR at 17 (citations omitted).] The ALJ found, without further elaboration, that "some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." [Id.] She found that plaintiff's ability to participate in those activities "diminishes the credibility of the claimant's allegations of functional limitations." [Id.]

An ALJ may rely on a claimant's daily activities to support an adverse credibility determination when those activities: (1) "contradict [claimant's] other testimony"; or (2) "meet the

1 threshold for transferable work skills." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). As a
2 result, a plaintiff's credibility may be discounted if he "is able to spend a substantial part of [his]
3 day performing household chores or other activities that are transferable to a work setting."
4 Smolen v. Chater, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996) (citation omitted). A claimant, however,
5 need not be "utterly incapacitated to be eligible for benefits . . . and many home activities are not
6 easily transferable to what may be the more grueling environment of the workplace, where it might
7 be impossible to periodically rest or take medication." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.
8 1989) (citations omitted); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (an ability to
9 engage in some physical activities is not necessarily inconsistent with a finding of disability).
10 "Even where those activities suggest some difficulty functioning, they may be grounds for
11 discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating
12 impairment." Molina, 674 F.3d at 1112 (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217,
13 1225 (9th Cir. 2010); Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009)).

15 An ALJ must identify "*which* daily activities conflicted with *which* part of [c]laimant's
16 testimony," pointing to *specific facts* in the record to support an adverse credibility finding. Burrell,
17 775 F.3d at 1138. Here, although the ALJ listed a few daily activities that plaintiff testified he is
18 able to do, the ALJ otherwise failed to elaborate at all on how these activities actually conflict with
19 plaintiff's subjective symptom testimony. For instance, the ALJ provided no information on how
20 plaintiff's ability to drive his children to and from school, shop a couple of times a week, prepare
21 his own meals, or spend time with others, negatively impacts plaintiff's testimony that his back and
22 neck pain, headaches, and arm numbness, make it difficult him to sit for more than one or two
23 hours at a time, stand for one to one and one-half hours at a time, turn his neck from side to side,
24 bend, and do daily household chores or yard work. [AR at 15.] Moreover, there is no indication
25 that plaintiff is doing these limited activities for any extended period of time or even every day. In
26 fact, he testified that there are days that he is in bed all day, and sometimes "for a couple of days
27 straight because of pain" [AR at 47] and, with respect to preparing his meals, plaintiff stated in his
28 function report that he generally makes cereal and sandwiches and spends only a few minutes

to do that. [AR at 237.] Similarly, although he may go shopping a couple of times a week, plaintiff states that he takes his children with him to help, and spends about fifteen minutes doing the shopping. [AR at 238.] Thus, the ALJ did not meet her burden of showing how plaintiff's daily activities either contradict plaintiff's other testimony, or meet the threshold for transferable work skills, sufficient to support her adverse credibility determination.

The ALJ also noted that plaintiff's record "reflects work activity" after the alleged onset date, showing that he worked in 2007, 2008, 2009, 2010, and 2011, and indicating that plaintiff's activities have "at least at times, been somewhat greater" than he has generally reported. [AR at 16 (citation omitted).] At least some of this "work activity" appears to be based on plaintiff's working for about a year and a half, through the first quarter of 2012, as a home care provider for his elderly grandfather for approximately thirty hours per month, and some may be related to his prior work as a handyman. [See, e.g., AR at 13, 34-35, 184-85.] Plaintiff testified that he had to stop working as the home care provider in 2012, and his work as a handyman in 2010, because he could no longer physically do the work. [AR at 34-35, 184.] He further testified that when he was working as a handyman and a mover between 2005 and 2010, he was sometimes working only one day a week. [AR at 49-50.] Plaintiff's work from January 2007 through May 2010 was considered by the Administration to be an "[u]nsuccessful work attempt" and, as noted by the ALJ, was at a level that did not "constitute disqualifying substantial gainful activity." [AR at 16, 182 (noting that from January 2007 through December 2009, plaintiff's work was below the level of substantial gainful activity and although he attempted from January 2010 to May 2010 to work above the substantial gainful activity level, this "did not last due to his condition"); see also AR at 49-50.] Thus, these attempts at work do not contradict plaintiff's testimony, nor are they indicative that plaintiff could otherwise perform work at the level of substantial gainful activity. See, e.g., 20 C.F.R. §§ 404.1573, 416.947.

Based on the foregoing, the ALJ did not provide specific, clear and convincing reasons supported by substantial evidence for discounting plaintiff's subjective symptom testimony based on his activities of daily living or his work activity record, and remand is warranted on this claim.

**B.     DEVELOPMENT OF THE RECORD**

Plaintiff contends that the ALJ failed to fully and fairly develop the record. [JS at 16-18.] He contends that the ALJ "was aware that surgical interventions were being considered to treat Plaintiff's impairments," and should have attempted to contact plaintiff's treating physicians, Dr. Oliveira and Dr. Uddin, "to determine the status and necessity of future surgical interventions," rather than simply rejecting his claim "because he had not yet had any surgical interventions at the time of the hearing." [JS at 17.] Alternatively, he suggests the ALJ should have left the record open to obtain additional documentation regarding plaintiff's treatment. [Id.] Respondent counters that it is plaintiff's burden to produce complete medical records, and that plaintiff could have submitted those records to the Appeals Council or to this Court.[8] [JS at 18-19 (citations omitted).] Respondent also contends that there was no ambiguity in the record regarding this issue and the record was sufficient to allow for proper evaluation of the evidence, and therefore, the ALJ had no duty to further develop the record regarding this issue. [Id.]

Because the matter is being remanded for the ALJ to reconsider plaintiff's credibility, which may impact on the issue of whether plaintiff is a candidate for future surgical intervention, on remand the ALJ shall also reconsider this issue.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. See Lingenfelter, 504 F.3d at 1041 (9th Cir.

---

[8] Respondent notes that Dr. Clark's March 11, 2010, statement that "surgical intervention [for plaintiff's cervical impairment] does appear prudent" [AR at 587], is contradicted by the April 12, 2011, statement by Dr. Yoo that plaintiff "is not a good . . . candidate" for cervical surgery [AR at 569], and with the November 2009 assessment by Dr. Martin that plaintiff's back impairment would clear up in approximately five weeks [AR at 632]. [JS at 19.] The Court has previously discussed the ambiguity of Dr. Yoo's statement [see Discussion supra note 7], and notes that Dr. Martin was referring to plaintiff's lumbar fractures and not his cervical impairment. [AR at 632.]

2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, the ALJ shall allow plaintiff to supplement the medical record with any new medical evidence. Second, the ALJ shall fully develop the record relating to plaintiff's candidacy for surgical intervention. Third, because the ALJ failed to provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand shall reassess plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony. Next, if necessary, the ALJ shall reconsider all of plaintiff's limitations in making his RFC determination. Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[9]

## VII.

## **CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

---

[9] Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to his past relevant work.

17

1    **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: May 7, 2015

                                      PAUL L. ABRAMS
                     UNITED STATES MAGISTRATE JUDGE